UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:08CR177 HEA |
| ) | |
| CHARLES R. MURRAY, ) | |
| ) | |
| Defendant. ) | |

# MEMORANDUM AND RECOMMENDATION
# OF UNITED STATES MAGISTRATE JUDGE

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b). Presently pending are the Defendant's motion to suppress statements and motion to suppress physical evidence. After setting the matter for hearing, the Defendant requested that the hearing be rescheduled at a time after the forensic expert completed his examination of evidence and prepare the report. Further, after notifying the Court that the examination of his forensic expert was complete, the undersigned set the hearing on July 28, 2008. The Defendant requested that the hearing on July 28, 2008 be continued, and the undersigned held a status conference with the parties to determine a date for holding the evidentiary hearing in this matter. The parties agreed on the date of September 5, 2008. Subsequently, the undersigned held an evidentiary hearing on September 5, 2008, and requested that a transcript of the hearing be prepared. In addition, on September 22, 2008, the Defendant requested that the hearing be re-opened, and the undersigned set a supplemental hearing on October 15, 2008. Further, the Government requested that the supplemental hearing be continued, and without objection of the Defendant, the undersigned reset the hearing to October 18, 2008. Subsequently, on October 23, 2008, the Government again

requested that the hearing be continued, and without objection of the Defendant, the matter was continued to December 1, 2008. On December 1, 2008, the undersigned held the supplemental hearing, and ordered that a transcript be prepared in this matter. Further, on December 8, 2008, the transcript of the supplemental hearing was filed in this matter.

Based upon the evidence adduced at the hearing on the motion to suppress, the undersigned makes the following findings of fact and conclusions of law:

**Findings of Fact**

Aaron Chapman is a Special Agent with the Immigration and Customs Enforcement Service. He has received special training in the investigation of child exploitation and child pornography cases, and also works with other agents who are experts in the field of child pornography and child exploitation.

In 2007, he was investigating a case involving Charles Murray who resided at 328 Charlottesville Drive in St. Charles, Missouri. In furtherance of this investigation, on July 9, 2007, Agent Chapman filed an application for a search warrant to search 328 Charlottesville Drive, St. Charles, Missouri. Attached to the application was an affidavit which was sworn to by Chapman before a United States Magistrate Judge. The affidavit states in pertinent part as follows:

Chapman's affidavit states that computers have revolutionized the way in which child pornography is utilized, produced, distributed, and stored. Child pornography can now be distributed by e-mail with photographs attached to the e-mails. It also allows people to use the internet and who are interested in child pornography, to enter chat rooms with other people also interested in child pornography and to correspond with them on a relatively anonymous basis. These chat rooms and other e-mail communications are ideal for child pornographers because once contact is made through

2

the chat rooms or by e-mails, child pornographers and collectors of child pornography can correspond relatively safely and relatively anonymously by using made up screen names.

Chapman was informed by another Customs agent that a search warrant was executed on a person named David Boren who resided in Veneta, Oregon. In interviewing Boren and analyzing his computer, Boren told the agents that he often entered AOL chat rooms which contained other participants who were very interested in child pornography. In particular, he often entered an AOL chat room that was populated by individuals who were interested in child pornography involving boys and girls from the ages of two years old to twelve years old. He stated he would enter the chat room and type the name LISTME, and thereafter correspond with everyone who was in the chat room. He stated that he traded child pornography with everyone who was listed in this chat room. He stated that one of the individuals with whom he traded child pornography was a person known by the screen name of "Omy1233." An analysis of Boren's computer revealed that several e-mails were sent to this person which contained attachments which contained child pornography. A Customs search warrant and summons revealed that the screen name "Omy1233" belonged to a person named Lee Sly in Ohio, who also subscribed to AOL, and had sent and received child pornography using his AOL account. Sly received the child pornography sometime in 2005. Investigation by Chapman also revealed that a police officer acting in an undercover capacity had become involved in an AOL chat room with a person later identified as Richard Darkey from Orland Park, Illinois. In online conversations with Darkey in the chat room, Darkey eventually sent the undercover officer e-mails which contained attachments containing graphic child pornography. One of these photographs originated from the online account of a person using the screen name "SIRIOUT3" which Darkey, after receiving the photograph, "SIRIOUT3" then forwarded it to the undercover officer. On

December 3, 2006, a search warrant was executed on the residence of Richard Darkey in Orland Park, Illinois, and Darkey's computer was seized and his wife was interviewed. Darkey's wife stated that she had seen numerous child pornography pictures downloaded by her husband from an America Online account. Darkey also admitted trading child pornography using his AOL account. An analysis of Richard Darkey's America Online account revealed that Darkey had traded child pornography with the individual stated above whose screen name was "SIRIOUT3." A grand jury subpoena for America Online records revealed that "SIRIOUT3" was a screen name registered to Lee Sly in Ohio. Lee Sly received and traded child pornography with Darkey. The Customs agents then requested and received a search warrant for Lee Sly's America Online account in the name of "SIRIOUT3." An analysis of this account revealed that Sly was engaged in trading child pornography with approximately one hundred and twenty-five individuals using his AOL e-mail account. One of the individuals to whom Sly sent child pornography was a person that went by the name of "AUncle Chester." A review of the e-mails and attachments sent to "AUncleChester" by Lee Sly reveal that on February 1, 2007, Sly sent six e-mail messages which contained attached thereto approximately thirteen photographs or files, each one containing graphic depictions of child pornography.[1] These child pornography images were sent from Lee Sly on his AOL account and received by "AUncleChester" on his AOL account. They were sent by way of six different e-mails sent on six different occasions over a forty-five minute period of time. On June 11, 2007, Customs agents served a summons on America Online seeking to obtain the subscriber information for "AUncleChester."

---

[1] The undersigned has compared the photographs supplied to the undersigned in Exhibit 4 of the supplemental evidentiary hearing. After comparing the photographs supplied by he Government to the descriptions in ¶ 12 of the affidavit, the undersigned finds the descriptions to be accurate.

The subpoenaed information indicated that the account "AUncleChester" was registered to Charles Murray of 328 Charlottesville Drive, in St. Charles, Missouri. Murray's internet service provider, according to America Online, was listed as Charter Communications in St. Louis, Missouri. After this, on June 18, 2007, the Customs agent issued a summons to Charter Communications for the current subscriber information, connection records, and service times for Charles Murray. On June 22, 2007, Charter Communications stated that they provided high speed internet service to 328 Charlottesville Drive, in St. Charles, Missouri, and that the account was active on the date that the child pornography was sent to "AUncleChester." Law enforcement records further revealed that Charles Murray's current address was 328 Charlottesville Drive, in St. Charles, Missouri, and his vehicle registration records showed that he lived at 328 Charlottesville Drive. Further, surveillance conducted within two weeks of the search showed that the vehicles registered to Charles Murray were parked at the location. Further, the affidavit states that child pornographers receive gratification from their child pornography and do not like to be away from it for long, and store and keep their child pornography with them for many years, and do not destroy it. Further, the affidavit states that information stored on computers remains on the computers and may be retrieved even if they are deleted.

Based on the above affidavit, a United States Magistrate Judge issued a warrant to search 328 Charlottesville Drive, in St. Charles, Missouri, and to seize images of child pornography contained on any computer, computer system, and related peripherals including tapes, cassettes, cartridges, streaming tapes, commercial software, computer discs, monitors, tape drives, hardware and software, operating manuals and other computer-related operation equipment, digital cameras, scanners, computer photographs and anything else that might be enjoyed with child pornography.

On July 10, 2007, Chapman, three other Customs agents, and an O'Fallon police officer went to 328 Charlottesville Drive in St. Charles, Missouri, to execute the search warrant. Chapman knocked on the door of the house at about 9:30 in the morning, and a child came to the door. The officer was in full uniform and the other agents were wearing vests clearly identifying them as law enforcement officers. Chapman asked if the child's father was at home, and the child said yes and walked away from the door apparently to find his father. Chapman followed the child into the house through the open door and found Charles Murray standing in the bedroom of the house. Chapman told Murray that he had a search warrant for his house, which they were going to execute, and, at this time, conducted a sweep of the premises to make sure no one else was in the premises and that there were not any hidden hazards.

He then asked Murray if he would talk to him about the search warrant. Murray stated that he would talk to him, and Chapman asked the Defendant if there was somewhere to sit down so they could carry on their conversation. Murray suggested that they sit at the kitchen table and Chapman and another agent and Murray sat at the kitchen table. Chapman told the Defendant that he wanted to talk to him about child pornography. He told Chapman he was not under arrest, and would not be arrested regardless of the outcome of the interview, and would not be going to jail. Chapman further made it clear to the Defendant that he would not be arrested, even if he decided not to talk to the agents. During the interview, which took approximately forty-six minutes, the Defendant took breaks to take care of his children, including giving one child cereal. Further, the Defendant took a break to retrieve a glass of water for himself. The children played in the great room, and were in and out of the kitchen during the interview. According to Chapman, it was made clear to him that he could talk to his children at any time he wished. Although the Defendant was free to walk around

6

the house, he was accompanied by agents while doing so. This was particularly the case while the search warrant was being executed. At the end of the interview, the Defendant's mother came to the house and retrieved the children. She was not in the house for any part of the interview. During the interview, no threats or promises were made to the Defendant. The agents left the house and did not arrest the Defendant.

## Conclusions of Law

A. The Execution of the Search Warrant

Based on the facts articulated above and below, the undersigned finds that the warrant was executed in a reasonable manner, and at any rate, the evidence in this case should not be suppressed because of the manner in which the warrant was executed.

The evidence in this case shows that the agents went to the door of the Defendant's premises with one police officer dressed in full uniform, and the other agents wearing vests clearly identifying themselves as law enforcement officers. They knocked on the door, and a child came to the door and opened it for them. They asked the child if his father was at home, and the child replied in the affirmative. He walked off apparently to find his father, leaving the door open behind him. The agents followed the child through the door and down a hallway toward the back bedroom. At that time, Agent Chapman observed the Defendant, and identified himself as a law enforcement officer and stated he was at the premises to execute a search warrant. No guns were drawn during the entry into the house or at any other time, the Defendant was not threatened when he was found in the hallway, nor was he handcuffed or restrained in any way. Agent Chapman said he entered the house because the door was open and the law enforcement officers' presence was already known or would be shortly known to the occupant of the premises. Chapman stated he did not know who else was

7

in the house, and wanted to enter to make sure that there were not any other persons or hidden hazards in the house which would adversely affect the safety of the officers.

Based on the above, the undersigned concludes that the execution of the warrant was reasonable. First, the undersigned concludes that if the officers' presence was already known to the occupants of the premises, it would be futile to thereafter announce one's presence. In United States v. Banks, 540 U.S. 31 (2003), the Court stated as follows in holding that officers need not announce their presence in any way when entering pursuant to a search warrant under circumstances where the presence of the officers was already known and the announcement would be futile. In so holding, the Court stated as follows:

> In Wilson v. Arkansas, 514 U.S. 927. . . (1995), we held that the common law knock-and-announce principle is one focus of the reasonableness enquiry; and we subsequently decided that although the standard generally requires the police to announce their intent to search before entering closed premises, the obligation gives way when officers "have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile"... Richards v. Wisconsin, 520 U.S. 385...When a warrant applicant gives reasonable grounds to expect futility or to suspect that one or another such exigency already exists or will arise instantly upon knocking, a magistrate judge is acting within the Constitution to authorize a "no-knock" entry. And even when executing a warrant silent about that, if circumstances support a reasonable suspicion of exigency when the officers arrive at the door, they may go straight in.

540 U.S. 31, 36-37.

In United States v. Tracy, 835 F.2d 1267 (8th Cir.1988), the officers knocked on the door of a dwelling, but failed to announce their purpose before breaking down the door to execute the search warrant. In upholding this entry, the Court stated as follows:

> Under these circumstances, we agree the officers could have justifiably believed defendants were anticipating their arrival and knew their purpose. Thus, announcing their purpose would have been a useless gesture.

United States v. Tracy, 835 F.2d 1267, 1270.

In United States v. Conley, 92 F.3d 157 (3rd Cir. 1996) (a case similar to the case now at bar), the agents executed a search warrant at a premises known as Conley Motor Freight. The building had two entrances and officers walked in the back door of the business, which was unlocked, unannounced before finding the owner of the premises and handing him the search warrant. In upholding this procedure, the Court stated as follows:

> Here the district court found that Conley saw the officers as they approached the back of the building, and that they entered an unlocked door leading to a storage room during daylight hours. When they entered the storage room, they announced their presence and the reason they had come. . .The court also found that the officers did not execute the warrant in a provocative manner likely to lead to violence. In Smith, in upholding the search, we indicated that "[a] thoughtful consideration of all of these factors led the district court to find that the search . . .was reasonable under the Fourth Amendment, despite the officers' failure to knock on the outer door and announce their presence before entering.". . .After considering the record, we independently reached the same result as the Smith panel and conclude that the district court properly found the search was reasonable.

92 F.3d 157, 171.

As in Banks, Tracy, and Conley, supra, the officers' presence was known since they had knocked at the front door in full uniform and had, at least, a reasonable belief that their presence was known to the occupants of the house. Further, they did not break open a locked door, but instead as in Conley, supra, executed the warrant in a reasonable and constitutional manner. Thus, based on the above, the undersigned concludes that the warrant was lawfully executed.

Alternatively, even if the knock and announce rule was violated in this case, that is no reason to suppress the evidence in this matter. First, in the case now at bar, there was no breaking open of an outer door as is required by §3109. Further, the Court stated as follows in United States v. Gaver, 452 F.3d 1007 (8th Cir. 2006):

> Since the district court's ruling, the Supreme Court has held that the exclusionary rule does not apply to violations of the knock-and-announce requirement of the Fourth

9

> Amendment. Hudson v. Michigan, __ U.S. __, ___, 126 S.Ct. 2159. . . Gaver's motion to suppress was premised entirely on his contention that the officers violated the Fourth Amendment by failing to knock and announce their presence, and Hudson disposes of this claim. We need not consider whether the officers acted reasonably by entering without knocking and announcing, because even if there were a violation of the Fourth Amendment, the exclusionary rule would be inapplicable.

452 F.3d 1007, 1008.

Therefore, the evidence should not be suppressed because the warrant was allegedly unlawfully executed.

### B. Probable Cause for the Issuance of the Search Warrant

Based on the above, the undersigned concludes that ample probable cause was articulated in the affidavit to justify the warrant to search the Defendant's premises for child pornography.

For a search warrant to be valid, it must be based upon a finding by a neutral and detached judicial officer that there is probable cause to believe that evidence, instrumentalities, or fruits of a crime or contraband may be found at the place to be searched. Johnson v. United States, 333 U.S. 10 (1948); Warden v. Hayden, 387 U.S. 294 (1967). The quantum of evidence needed to meet the probable cause standard has been addressed by the Supreme Court on numerous occasions.

> In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life upon which reasonable and prudent men, not legal technicians, act.

Brinegar v. United States, 338 U.S. 160, 176 (1949).

Probable cause exists if based upon a common sense consideration of all the circumstances set forth in the supporting affidavit, "there is a fair probability that contraband or evidence of crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). The critical element in a reasonable search is not that the owner of the property is suspected of a crime, but that there is

reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought. Zurcher v. Stanford Daily, 436 U.S. 547, 556 (1978).

Significantly, "finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision" as to whether a showing of probable cause has been met. Illinois v. Gates, 462 U.S. 213, 235 (1983).

The district court should not make a de novo determination of probable cause. Rather, "the decision to issue the warrant is upheld if supported by substantial evidence in the record." United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986). In other words, probable causes exists "so long as the [judge] had a substantial basis for. . .concluding that a search would uncover evidence of wrongdoing." See Gates, supra at 236. Moreover, a court may properly rely on normal inferences drawn by surrounding circumstances and allegations of facts contained in the affidavit. See United States v. Carlson, 697 F.2d 231, 238 (1983).

In United States v. Paton, 535 F.3d 829 (8th Cir. 2008), a warrant was issued to search the defendant's home for computers and other digital media which might have been used to photograph, possess, or manufacture child pornography. Although the affidavit contained evidence that the defendant had taken photographs of minors, none of these photographs took place in his home, nor was there any evidence directly linking the defendant to digital media kept in his home. There was, however, a statement based on the experience of a trained and long-time investigator in child pornography that child pornographers almost always kept these photographs in their home, and also were involved in trading child pornography on the internet by use of digital media. In upholding the warrant and its nexus, the Court stated as follows:

> "A warrant is supported by probable cause if there is a fair probability that contraband or evidence of a crime will be found in the place to be searched." . . . A magistrate

11

considers the totality of the circumstances in making a probable cause determination, and "a warrant is proper so long as the evidence as a whole creates a reasonable probability that the search will lead to the discovery of evidence."

535 F.3d 829, 836.

In United States v. Chrobak, 289 F.3d 1043 (8th Cir. 2002) (a case similar to the case now at bar), an FBI agent received information from the New York Attorney General's Office that an individual using a screen name had posted pornographic images on a web site that they were investigating. A subpoena of the internet service provider revealed that the screen name was registered to the defendant in North Little Rock, Arkansas. The agent received information that the telephone service was provided to Chrobak at that address as well as internet service, and the agents surveilled the address and observed a vehicle registered to Chrobak parked outside. She reviewed the photographs and described them in detail and stated in her affidavit that child pornographers almost always maintain and possess their materials at their home on a computer, and that they hold the material for long periods of time. In stating that the affidavit, which is quite similar to the one now at bar, showed probable cause, the Court stated as follows:

> Further, "[t]he source and credibility of evidence in support of a warrant request is considered in the totality of the circumstances analysis, and a warrant is proper so long as the evidence as a whole creates a reasonable probability that the search will lead to the discovery of evidence." Id. at 786. . .Agent Hill established a sufficient nexus between Chrobak and the internet moniker by providing evidence that the name was registered to him. She also established a sufficient nexus between the transfer in Chrobak's house by providing evidence that he lived there and that, in her experience, pedophiles maintain their child pornography in a secure place.

289 F.3d at 1046.

Based on the above, the undersigned concludes that ample probable cause was shown to search the Defendant's house, to seize images of child pornography contained on his computer or computer system or related digital media. The evidence shows that over a significant period of time,

two unrelated individuals, David Boren and Richard Darkey, received child pornography from the ultimate source of child pornography to the Defendant, Mr. Lee Sly. The evidence shows that Sly sent six separate e-mails to the Defendant containing numerous depictions of child pornography. Further, the affidavit shows that the e-mails were likely received by the Defendant and were likely to remain on the Defendant's computer for extended periods of time because of the nature of child pornographers. Further, the fact that the e-mails were separately received during a forty-five minute time period tends to show that they were in response to the Defendant's inquiries. This could lead the issuing magistrate judge to conclude that there were ongoing e-mail conversations between the Defendant and Sly, which is the same manner in which Boren and Darkey had received child pornography from Sly. Thus, based on the above, the undersigned concludes that there was probable cause to believe that child pornography was on the Defendant's computer given the description of the attachments of child pornography in the affidavit.

Further, the undersigned concludes that the probable cause for the issuance of the warrant is not stale. In this regard, the undersigned notes that there is no bright line test for staleness. See, United States v. Koelling, 992 F.2d 817 (8th Cir. 1983). In upholding the warrant, in United States v. Chrobak, approximately a three-month delay, the Court stated as follows:

> Agent Hill provided credible testimony from her professional experience that child pornographers generally retain their pornography for extended periods. On this basis, the magistrate judge could find a fair probability that Chrobak had child pornography at his home three months after the intercepted transfer. The magistrate judge also had to consider that the information had to pass from New York to Arkansas; Agent Hill had to independently verify the content of the images, the sender, and Chrobak's address. . .We hold the warrant was supported by probable cause.

United States v. Chrobak, 289 F.3d at 1046, 1047.

Given the above law, the undersigned concludes that the probable cause in this case is not stale. The affidavit shows that Lee Sly was dealing in child pornography from mid-2005 until at least February 1, 2007 when he transferred the child pornography to the Defendant. Further, during this period of time, Sly transferred child pornography to approximately 125 individuals. In addition, the affidavit showed through Agent Chapman's expertise and other persons' expertise that child pornographers tend to hold on to their child pornography for significant periods of time, even years, and that they seldom, if ever, want to be away from it. In addition, the affidavit states that child pornography could be discovered on computers by an electronic search even after it had been deleted. Thus, based on the above statements in the affidavit (which is quite similar to the affidavit upheld in Chrobak, supra,) the undersigned concludes that the probable cause was not stale.

The Defendant also cites case law from the Ninth Circuit indicating that in order to show probable cause to search a premises, an affidavit must show that the child pornography was willingly received by the defendant, and not sent accidentally by another person. See United States v. Weber, 923 F.2d 1338 (9th Cir. 1990). The undersigned concludes that even if this were the standard, applying this standard to the affidavit in this case, it contains ample information to show that the child pornography was willingly received.

In United States v. Kelley, 482 F.3d 1047 (9th Cir. 2007), the defendant received e-mails from a known child pornographer. He received these e-mails under two different screen names. In holding that the affidavit showed probable cause that the items had been willingly received even in the absence of a solicitation from the defendant, the Court stated as follows:

> Thus, the salient facts are that Kelley, using two different screen names, received nine different e-mails with numerous attachments containing the same type of illicit child pornography that two other unrelated individuals also had on their computers. There is no questions at least one of these individuals Mumenthaler, also distributes child

> pornography, and that Hutchings collects it. As the affidavit explains, those who collect child pornography often collect addresses of persons with similar interests as a means of referral, exchange, and profit. The reasonable inference from the receipt of e-mails in care of different screen names that pertain to a discrete type of pornography--young boys in sexually explicit poses--and also ended up on the computers of two unrelated people who were also receiving or distributing the same type of material, is that Kelley was part of a network of persons interested in child pornography primarily involving young boys. As a matter of practical common sense, this is unlikely to occur without prior communication or connection. From these circumstances, it is reasonable to infer a "fair probability" that attachments depicting child pornography were addressed to Kelley's screen name because he wanted them to be.

482 F.3d 1047, 1053.

Based on the above law, the affidavit in the current case shows that the matter was willingly received. The affidavit reveals that two other individuals, David Boren and Richard Darkey, received child pornography from Lee Sly, a known distributor of child pornography on separate occasions. Both Darkey and Born were unrelated except for their contact with Sly which came through chat rooms during which they directly or indirectly solicited child pornography. The affidavit also stated that Lee Sly sent six separate e-mails to the Defendant with numerous attachments containing child pornography. The e-mails were sent during a forty-five minute time period between 3 and 4 eastern time in the morning on February 1, 2007. The e-mails were received by the Defendant not all at one time but in staggered intervals with the first e-mail being received at 3:15 a.m., the second at 3:23 a.m., the third at 3:28 a.m., the fourth at 3:37 a.m., the fifth at 3:49 a.m., and the sixth at 4:01 a.m. From this sequence, a magistrate judge could reasonably infer that these e-mails took place during back and forth conversations or chat room visits between Sly and the Defendant. This is particularly so because the subject of the 4:01 e-mail from Sly to the Defendant is "two chicks" and the computer parlance shows it to be a reply to a previous e-mail. Thus, the undersigned concludes that, as in Kelley above, even though there is no direct evidence of solicitation of the child pornography, there

is more than ample information in the affidavit from which a magistrate judge could reasonably infer that it was willingly received. Therefore, the items should not be suppressed.

### C. Statements Made by the Defendant

Based on the above findings, the undersigned concludes that the statements made by the Defendant were non-custodial statements and were voluntarily made to the agents, and should not be suppressed. In determining whether the Defendant was in custody, the court must consider whether under the totality of the circumstances the agents deprived the Defendant of his freedom in any significant way, and if a reasonable person under similar circumstances would believe that he was under arrest. Miranda v. Arizona, 384 U.S. 436, 444 (1966); Berkemer v. McCarty, 468 U.S. 420 (1984).

In United States v. Sutera, 933 F.2d 641 (8th Cir. 1991), FBI agents executed a search warrant on the defendant's apartment, defendant's car, and on defendant's person, thoroughly searched the defendant's person, and frisked him for weapons. His movement was also restricted in his apartment in that he could not go into areas which were being searched, and was accompanied by agents. Further, the defendant was accompanied to a second location by agents to obtain documents. In holding that the defendant was not in custody, the Court stated as follows:

> It is also relevant that Sutera was on his own turf. Except for the brief period when Sutera and Burns drove to get the address book, Sutera was interviewed in the apartment that he was occupying. While a person may be deemed to be in custody even in his own home, it is not the type of coercive setting normally associated with custodial interrogation...Finally, we feel it is very important that the officers did not contemplate arresting Sutera either before or after the interview. At the evidentiary hearing, Agent King testified why Sutera was not given Miranda warnings, stating 'Sutera was not in custody; he was not under arrest; we did not contemplate an arrest.'

United States v. Sutera, 933 F.2d 641, 647 (8th Cir. 1991).

The undersigned concludes that almost exactly the same factual situation exists in the case now at bar. The agents interviewed the Defendant in his home, and prior to the interview starting, the Defendant was told that he was not under arrest and would not be arrested regardless of whether or not he agreed to be interviewed on that day.[2] Further, during the interview, the Defendant was allowed to make a bowl of cereal for his child and give it to the child, and obtain at least one drink of water. He further was allowed to call his mother, and to have her come and take care of his children. He was also allowed to go outside the house after the interview was over with and talk to his mother. During the time when the search warrant was being executed, the Defendant, as in Sutera, supra, was with an agent when he moved about the house. The evidence also shows that the agents asked if they could talk to him about the matters contained in the search warrant and he agreed

---

[2] The Defendant also testified at the hearing. He stated that he did not choose the kitchen as a place of the interview, but, rather, was "guided" to the kitchen by Agent Chapman. He further stated that he was not told that he would not be arrested until after the interview, and that his "impression" was that he was under arrest. He also said that although the interview took place in the kitchen, it did not take place at the kitchen table, but, rather, in a corner of the kitchen. He also testified that during the interview he obtained a bowl of cereal for his son, and, separately, a glass of water for himself. He testified that Agent Chapman said he would like to ask him some questions, and the Defendant answered Chapman's questions. He also said that no guns were drawn at any time while the agents were in the house, that he was not touched physically in any way by the agents, that he was not directed to sit down verbally by the agents, that he was not verbally told to go to the kitchen by the agents, that voices were not raised during the entire time the agents were in the house, that he was not physically restrained in any way, and that he was not threatened in any manner nor was he verbally abused. Agent Chapman testified very similarly to the Defendant, except that Agent Chapman testified that he told the Defendant before the interview started that he was not under arrest and would not be arrested that day, and that the Defendant chose the kitchen table as the location where the interview would take place. The undersigned, who observed the witnesses in this matter, observed Agent Chapman to be a very credible witness who answered both the direct and cross examinations in a forthright, full, and unequivocal manner. Therefore, to the extent that Agent Chapman's testimony conflicts with the Defendant, the undersigned accepts Agent Chapman's testimony and rejects the testimony of the Defendant to the extent it conflicts with Chapman's. This is particularly so given the fact that the Defendant, through his own testimony, corroborates much of what Chapman has to say about the search and interview process.

to talk to them. No guns were drawn during the execution of the search warrant, voices were not raised to the Defendant, no threats or promises were made to the Defendant, and he was not physically restrained in any way. In short, the evidence shows that he was treated courteously by the agents during the entire interview process.

Based on the above, the undersigned concludes, as did the Court in Sutera, that the Defendant's freedom of movement was not restricted in any significant way, that he was told that he was not under arrest during the interview and would not be arrested at that time, and that, therefore, a reasonable person in the Defendant's position would not believe that he was under arrest while sitting in his kitchen talking to agents. The fact that the Defendant may have subjectively held the view that he was in custody or that he was being directed to do things, does not change the fact that a reasonable person would not have believed he was under arrest. Thus, the undersigned concludes that the Defendant's statements were non-custodial, and it was not required that the Defendant be given his Miranda warnings. See Berkemer v. McCarty, supra. The fact that a subject may have been a suspect in a crime does not trigger any right on his part to be given Miranda warnings. California v. Beheler, 463 U.S. 1121 (1983). As stated, the Defendant was treated courteously by the agents, the Defendant was never threatened, handcuffed, or intimidated by any actions of the agents during the interview process. Therefore, the undersigned concludes that based on the totality of the circumstances of the Defendant's questioning, the Defendant's statement was voluntary and his free will was not overborne by anything that took place during the interview. Miranda v. Arizona, 384 U.S. 436, 467-75 (1966); North Carolina v. Butler, 441 U.S. 369 (1979); Colorado v. Connelly, 479 U.S. 157 (1986); Moran v. Burbine, 475 U.S. 412 (1986).

**Conclusion**

Therefore, for all of the reasons stated above, the Defendant's motion to suppress statements and motion to suppress physical evidence should be **denied**.

\* \* \*

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that the Motion to Suppress Statements [Doc. #15] and Motion of Defendant to Suppress Physical Evidence [Doc. #16] be **denied**.

Further, the parties are advised that they have until January 23, 2009 in which to file written objections to this recommendation and determination. Failure to timely file objections may result in waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

          /s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this 12th day of January, 2009.